HEARD APRIL TERM, 1871.

## FARRAR *vs.* FARLEY.

One of two joint assignees for the benefit of creditors, purchased, at their own sale, in February, 1856, two tracts of land and a slave, and in January, 1857, he sold the lands at an advanced price: *Held*, That he was chargeable, in his account with creditors, with the price of the slave, and with the advanced price of the lands.

An assignee for the benefit of creditors who purchases some of the debts at less than their nominal amounts, is not entitled to credits on his account with other creditors, for the full amounts of the debts. He can only claim as disbursements what he actually paid.

An assignee for the benefit of creditors is liable for interest as other trustees are, and a creditor whose debt bears interest at law is entitled to interest as against the assignee.

### BEFORE CARROLL, CH., AT LAURENS, JUNE, 1868.

In January and April, 1855, Joseph Crews made five separate assignments for the benefit of his sureties and creditors as follows: On January 18, he made an assignment to Lewis Dial of a number of notes "to satisfy certain judgments and other claims," which Dial held against him; on January 23, he made an assignment to W. R. Farley of other notes to pay the claims held by Dial against him; on April 7, he made another assignment to Dial, of notes to indemnify Dial, as his surety, to certain creditors therein named; on April 10, he made an assignment to Farley and Dial of two tracts of land and a slave named Alfred, with power to sell the same and apply the proceeds to the payment of certain debts of Crews, for which the assignees were liable as his sureties, and on April 13, he made a general assignment to Farley of all his effects, inclusive " of any excess of funds that may arise " from the said previous assignments, in trust: 1, to pay expenses; 2, to fully indemnify the assignees as his sureties; 3, to pay two specified judgments; and 4, to pay all his other creditors in full, or *pro rata*, who should execute a release of any balance that might be due them.

At the dates of the assignments, the plaintiffs, S. S. Farrar & Brothers, were judgment creditors of Crews to the amount of $2,417.51, besides interest, and entitled to come in under the trusts of the last assignment, numbered 4. They came in and accepted its terms.

The two tracts of land and the slave Alfred were sold by the assignees on February 4, 1856, on a credit of six months, with interest, and were purchased by Dial; the lands at the price of $3,800,

and the slave at the price of $719. Dial complied with the terms of sale, by giving his note to Farley and himself for the purchase money, and on January 23, 1857, he sold the lands to Dr. Fuller at the advanced price of $5,867.

On April 27, 1857, the plaintiffs filed this bill for account against Farley, Crews and Dial, who appeared and put in answers to the same. In August, 1860, Farley died, leaving a will, and his executrix, Phœbe M. Farley, was made a party defendant and answered the bill.

All matters of account were referred to the Commissioner, and he, in 1868, submitted his report, wherein he charged Dial with all moneys which he or his agent had received arising from any of the assignments, and with the price, $719, at which he had bid off the slave. He refused to charge him with the hire of the slave for one year, and also with $5,867, the advanced price at which he had sold the lands to Fuller. He also refused to allow the plaintiffs interest on their judgment, or to charge Dial with interest, giving as his reason, that "after the long lapse of time since this suit was instituted, its intricate, complex and voluminous character, the changes produced everywhere by the events of the last few years, and from the fact that the interest would sum very near concurrently on both the debit and credit sides of the accounting, and from the at least apparent uncertainty of fixing the precise time of many of the transactions, the Commissioner doubts if he could have arrived at any more satisfactory and equitable conclusion by an effort to compute interest."

On the taking of the account it appeared that the debts of Crews, which were protected by the several assignments, amounted in the whole, exclusive of the plaintiffs' and one other very inconsiderable debt to J. T. and J. S. Penn, to $26,477.18, and that Dial had compromised with the parties owning those debts and purchased them all for $8,522. Dial claimed credit on his account for those debts to their full amounts, and the Commissioner allowed the claim against the objection of the plaintiffs who insisted that the sums actually paid by him were all that he could rightfully claim. The other facts appear in the Circuit decree.

The case came before the Circuit Court on exceptions to the report taken by the plaintiffs, and also by Crews and Dial. The points made by the exceptions will be sufficiently understood from the foregoing statement, and the decree, so much of which as relates to the points decided by this Court, is as follows:

CARROLL, Ch. The parties complainant, as well as defendant, have filed exceptions to the Commissioner's report. Those taken by the plaintiffs will be first considered.

In the statement of the accounts submitted by the Commissioner there is no computation of interest. It is not shown that the moneys received by the defendant, Dial, remained, without fault on his part, idle or unproductive in his hands; nor do any circumstances appear which render it inequitable to compute interest against him, according to the ordinary course and rule of the Court. "It is rarely disallowed in the adjustment of accounts, for it is rarely otherwise than an equitable claim." The plaintiffs' judgment debt is at law an interest-bearing demand, and in such case it is said this Court is "bound to allow interest."—*Hunt* vs. *Smith*, 3 Rich. Eq., 536.

The plaintiffs' last exception (the eleventh) is sustained.

It is contended by the plaintiffs that the defendant, Dial, should be charged with the notes and choses in action, which were comprised in the assignments, dated respectively the 18th and 23d January, and the 7th, 10th and 13th April, 1855, and which he represents to have never been collected. There was no evidence adduced as to the solvency of the persons by whom these debts were due, or whether, with proper diligence, all or any of them might have been collected; the contest at the hearing was upon whom rested the burden of proof. In *Styles* vs. *Guy*, 16 Sim., Ch. R., 232, the Vice Chancellor remarks: "If an executor is sued for a *devastavit* in not having recovered a debt due to his testator's estate, all that is necessary for the plaintiff to show is that the debt existed, and that the executor took no steps to call it in. Insolvency cannot be presumed." Whether so stringent a rule should be held applicable to the defendant, Dial, need not now to be determined. The "uncollected assets" referred to amount to more than sixteen thousand dollars. They include the remnant and refuse of the mercantile debts that were due to the Assignor, Crews, It is morally certain that all of them could not have been collected by Dial. In their answer, filed as far back as June, 1859, both Dial and Crews express the opinion that "probably as much as $1,000 or $1,500 may be yet realized from debts still outstanding in favor of the assigned estate," but the residue "they regard as worthless." Though this statement be regarded merely as matter of discharge, and not of itself evidence, it may yet be considered by the Court. In respect of the mere conduct of the cause, certainly proof to some extent

may be adduced as to how much of the debts referred to might, with due diligence, have been collected. No additional delay will result from allowing the parties the opportunity to produce such proof, as the report must be recommitted upon other grounds. A further inquiry before the Commissioner will be directed as to the debts in question. Substantial justice seems to demand it, and the Court, therefore, withholds its judgment as to the 1st, 3d and 5th of the plaintiffs' exceptions; and also as to the first of the specifications, contained in the plaintiffs' 9th exception.

The more important questions in the case remain to be considered, and they are those proposed by the seventh and tenth of the exceptions to the report on the part of the plaintiffs. Under Crews' deed of 10th of April, 1855, the defendants, W. R. Farley and Lewis Dial, are the assignees. At their sale of the property comprised in that deed, on 4th February, 1856, Dial became the purchaser of the lands and mills, at the price of $3,800, payable six months thereafter, with interest from the day of sale. On the 23d January, 1857, Dial sold the property he had thus purchased at the advanced price of $5,867, and the plaintiffs, in their tenth exception, contend that he should be held accountable for the latter sum.

It is the rule of this Court, framed upon public policy, that a trustee, though invested with a general power to sell, is disabled from purchasing the trust property. "A trustee to sell and manage for others," says Lord Eldon, "undertakes in the same moment in which he becomes trustee, not to manage for the benefit of himself."—*Lacy, Ex Parte,* 6 Vesey, 626. So also "A trustee is never permitted to make any profit to himself in any of the concerns of his trust." Such profit belongs to his beneficiaries.—1 Story's Eq., §§ 322–3.

These principles are not confined to technical trusts, but extend generally to all like fiduciary relations. It has been repeatedly adjudged that they apply to assignments by an insolvent debtor, for the benefit of his creditors. *Ex Parte Wiggins,* 1 Hill Ch., 353 ; *Lacy, Ex Parte,* 6 Vesey, 626. That there were here two assignees, and that only *one* of them became the purchaser, cannot avail to make valid the sale. In each of the cases last referred to, the purchase set aside was by *one* of *several* assignees. In Hill on Trustees, 538, it is said that "the rule of Equity interdicting the purchase of the trust estate by trustees, applies as much to *one* of *several* trustees, as to a *sole* trustee." It is manifest that by the effect of Crews' assignment of the 13th April, 1855, his general creditors have an

interest in the faithful performance of the duties assumed by the assignees, respectively, under each and all of his previous assignments. The result is that the defendant, Dial, should be held accountable for the enhanced price at which he sold the lands and mills to his vendee, Dr. Fuller: and the plaintiffs' seventh exception is to that extent sustained; as also in regard to the hire of the negro Alfred. As to the rents of the lands and mills, the Court perceives no sufficient reason to dissent from the ruling of the Commissioner upon that subject in his amended report, and the residue of the plaintiffs' seventh exception is overruled.

A portion of the assigned effects came to Dial's hands as sole assignee under Crews' assignments of 18th January and 7th April, 1855, and another portion was received by Dial as assignee conjointly with Farley, under the assignment of 10th April. Dial also became the purchaser of the stock of goods included in the assignment to Farley of 13th April, 1855, at the price of $3,938.97, Dial agreeing with Farley "to apply the aforesaid sum to the payment of the debts of the assignor, Joseph Crews, as provided for" in that assignment. Farley's health failing, and rendering his absence necessary, Crews was left in charge of the assigned effects that were in the hands of Farley, "and thus had access to the notes, books and papers belonging thereto, and made collections," which he paid to Dial. The great bulk of the assigned effects thus passed into the hands and custody of Dial. His possession as to much the larger portion, if not the whole of these effects, was palpably fiduciary.

Between the execution of the several assignments referred to and the filing of the bill on the 27th April, 1859, Dial obtained assignments of all the debts against Crews except that of the plaintiffs and a small demand due J. T. & J. S. Penn. The debts so assigned to Dial amount to $26,477.18, for which he paid $8,522.00. These debts Dial now sets up at their full amount, and claims, as assignee of the same, the whole dividend of the assigned effects that would have been applicable to them, if presented by the original creditors. It is charged in the bill that "large sums of money arising from the assets embraced in the assignment aforesaid, instead of being applied to the payment of the creditors, were used by Crews and Dial in compromising with the creditors of the former." In their answer the defendants, Dial and Crews, reply that all the money received by Dial from the assigned effects "was used as a common fund of his own, and he and Crews are unable to state what amount of it was used in buying the debts or purchasing the goods."

There is no rule of equity better settled, says the Court, than that a trustee shall not be permitted to employ the trust funds for his own benefit. All purchases made with the funds of the trust estate will be considered for the benefit of the *cestui que trust.* It is no answer on the part of the defendant that he has so mixed up the two funds together that he cannot distinguish the one from the other. A person may sometimes, by mixing the estate of another with his own, subject himself to the loss of both; for it is his own fault. " that they have not been kept separate."—*Myers* vs. *Myers,* 2 McC. Ch., 214. The moneys arising from the assigned estate and effects in the hands of Dial seem to have exceeded in amount the price at which he purchased the debts against Crews; and the probability seems to be that those moneys were liberally employed for that purpose. Though Dial had employed his own funds exclusively in purchasing the debts assigned to him, yet he would not be allowed to make profit to himself by the purchase. His relation towards the general creditors of Crews was essentially fiduciary, in respect, at least, of the great bulk of the assigned estate, and its proceeds in his custody. How much had been collected out of them, or might be collected, were matters, of necessity, unknown to the great mass of Crews' creditors. They could only obtain information upon the subject from Dial himself, and it was within his power to impart or withhold it, as he pleased. His statements as to the assets of the assigned estate must naturally have had more influence with the creditors than those of another person without his facilities of information. Such means of information at his command he was bound to employ for the benefit of the creditors, and not of himself.

In *Lacy, Ex Parte,* already cited, one of the assignees of a bankrupt, purchasing dividends of the latter's estate, was held to be a trustee for the creditors or the bankrupt, according to circumstances. " As assignees cannot buy the estate of the bankrupt," says Lord Eldon, " so, also, they cannot, for their own benefit, buy an interest in the bankrupt estate; because they are trustees for the creditors. In that respect," he adds, " there is no difference between assignees and executors, who cannot, for their own benefit, buy the debts of the creditors." See, also, *James, Ex Parte,* 8 Ves., 337. If trustees or executors buy in any debt or incumbrances, to which the trust estate is liable, for a less sum than is actually due thereon, they will not be allowed to take the benefit to themselves; but the other creditors, or legatees, shall have the advantage of it.

Lewin on Trusts, 318, and authorities there cited; 2 Wms. Executors, 1669; American notes, to *Woollam* vs. *Heorn*, 2 Eq. Lead. Cases, 714. In the transaction under consideration is found the double vice of trustee purchasing for himself an interest in the trust estate, and employing for that purpose the trust fund in his custody. As to the debts of Crews, purchased by Lewis Dial, it is considered that the dividends of the assigned estate, which would have been applicable to them, if retained by the original creditors, cannot be demanded by Dial, except to the extent of reimbursing himself the sums actually paid for their purchase, with interest. After *that* is accomplished, the debts so purchased by Dial must, as against the plaintiffs and the Messrs. Penn, be treated as extinguished until those creditors have been fully paid. The plaintiffs' tenth exception is sustained to the extent indicated.

If the assigned estate and effects of Crews shall prove sufficient to pay his debts to the plaintiffs and to T. J. &. J. S. Penn, without any aid from the "uncollected assets," and without excluding the contested credit for the alleged payment by Dial to Yeakle, Cobb & Co., then the enquiry hereinbelow directed to be made by the Commissioner as to these matters, will, of course, become unnecessary. Crews makes no complaint against Dial. On the contrary, he co-operated and concurred with him in most of his unauthorized acts, and is understood to be content with all of them. Indeed, Crews unites with Dial in his defence throughout, and, as against him, is entitled to no relief whatever.

The exceptions on the part of the defendants, Crews and Dial, are yet to be considered. No sufficient reason appears for the Commissioner's omission to compute interest upon Dial's demands against Crews, according to the usual course of rules of accounting, as recognized by the Court. To that extent, the third and sixth exceptions of these defendants are sustained. Dial appears to have been fairly credited with all his payments upon Crews' debt to Wardlaw, Walker & Burnside. It is not shown that Dial's just claims, as assignee of Cooper's judgment against Crews, have been disregarded by the Commissioner.

The contract for the slave, Alfred, is considered as executed, and Dial is very properly charged with the price which he agreed to pay, and which, as assignee, he must be held to have received.

The exceptions to the report taken by the defendants, Crews and Dial, (except those numbered three and six,) are overruled.

It is ordered and adjudged, that this opinion stand for the decree of the Court.

It is further ordered, that the report be recommitted, and be reformed conformably to the principles of this decree. And it is further ordered, that the Commissioner enquire and report how much of the "uncollected assets" included in the several assignments by Joseph Crews, herein above mentioned, might have been collected by the defendant, Lewis Dial, with due diligence on his part; and that the Commissioner make further inquiry, and receive further evidence as to the credit claimed by Dial for his alleged payment to Yeakle, Cobb & Co., and that he report thereon. And it is also ordered, that the parties have leave to move for such further orders as may be necessary or proper. Let the costs of this suit be paid by the defendant, Lewis Dial.

The Defendants, Dial and Crews, appealed to this Court on grounds which renewed all the points decided against them by the decree of the Circuit Court.

*Sullivan,* for appellants:

1. It is contrary to law and justice to charge Lewis Dial with the price he sold the land and mills for, when he had previously purchased them at a public and fair sale; and that he ought not to have been charged either with the price of the slave Alfred, or with his hire. That the property sold under the fourth assignment was not sufficient to pay the creditors provided for in it, and the plaintiffs not being *cestui que* trusts under it, have no right to complain.

2. Even if the plaintiffs had any right to complain, they have not exercised it, by electing to have a resale, or to hold Lewis Dial to his purchase.

*Sollee* vs. *Croft,* 7 Rich. Eq., 34: "When a trustee to sell purchases without leave of the Court, it is at the option of the *cestui que* trust to have a resale, or to hold the trustee to his purchase."

3. It is unjust and inequitable to charge Lewis Dial with the funds received by W. R. Farley, the sole assignee, under the last and fifth assignment, farther than he actually received them. But, on the contrary, Mrs. Phœby Farley, his executrix, should have been adjudged liable for the amount received and held by her testator, and especially when she made no exception to the Commissioner's report on that subject, as to what he had received under the fifth or any of Crews' assignments.

4. Lewis Dial was entitled to all he received, and more than he

did realize, from the assigned estate, and the plaintiffs were entitled to no decree against him, and he should not be subjected to any further accounting.

*Young & Tompson*, contra:

1. Can these defendants be required to account in this proceeding for the funds received by them under the fifth assignment?

Farley was assignee, and, of course, is accountable. Dial & Crews received certain funds, *knowing* they were *trust funds*. This makes them accountable.—*Chaplin* vs. *Givens*, Rice 3–132; 2 Maddock's Ch., 125.

2. Can they be required to account for the sums received by them under the previous assignments, over and above what was necessary to carry out the objects of said assignments?

The excess of the previous assignments was assigned in express terms, in the fifth assignment for the benefit of these and other creditors, and although this was a mere equity in Crews, he had a right to assign it for the benefit of his creditors.—2 Story's Eq., § 974.

"Trusts in real property, which are exclusively cognizable in equity, are now in many respects governed by the same rules as the like estates at law, and afford a striking example of the maxim, that '*Equitas sequitur legem*.' Thus, for example, they are descendible, devisable and alienable, and heirs' devisees and alienees may, and generally do, take the same interests in point of construction and duration as would, under like circumstances, apply to legal estates." 2 Story's Eq., § 974.

"But Courts of Equity have long since totally disregarded this nicety. They accordingly give effect to assignments of trusts, and possibilities of trusts, and contingent interests and expectances, whether they are in real or in personal estate, as well as assignment of choses in action.—2 Story's Eq., § 1040.

3. An equity or trust interest may be held in equity, liable for the debts of a party, whether he makes an assignment for that purpose or not.

"Though the mode of procedure is somewhat different, equitable estates are as much liable for debts as legal."—*Heath* vs. *Bishop*, 4 Rich., 946.

"There is no form or mode by which property, with a present vested right of several enjoyment as to either the corpus or income, may be given to or enjoyed by one, and not be liable for the payment of his debts."—*Heath* vs. *Bishop*, 4 Rich. E., 46.

Much more ought this to be done in equity, where the owner of the trust, as in this instance, has assigned his trust for the payment of his debts. He assigned this excess, and the creditors accepted under the assignment, and it would now be a fraud to allow him to defeat the assignment *upon a pretext* like this.

The decree of the Chancellor directs interest to be charged on both sides.

" Interest is rarely disallowed in the adjustment of accounts, for it is rarely otherwise than on equitable claim."—*Hunt* vs. *Smith*, 3 Rich. Eq., 536.

Can defendant Dial be charged with the enhanced price of the land and mills?

A " trustee to sell and manage for others," says Lord Eldon, " undertakes in the same moment in which he becomes trustee, not to manage for the benefit of himself."—*Lacy, ex parte*, 6 Vesey, 626.

" A trustee is never permitted to make any profit to himself in any of the concerns of his trust."—1 Story's Eq., § 322.

" A trustee cannot make any advantage to himself in the management of the trust estate."—*McNeel* vs. *Morrow*, 8 Rich. Eq., 174.

" A trustee cannot act for his own benefit in a contract on the subject of the trust."—*Green* vs. *Winter*, 1 John Ch., 36; *Perkins* vs. *Alexander*, 1 John Ch., 397.

It would be in conflict with the above authorities to allow Dial to purchase the lands and mills at his own sale and to resell at a profit.

A trustee has no right to purchase at his own sale, and the Court of Equity will give redress either by ordering a resale, or if it had been resold by the trustee at an advance, by requiring him to account for the advanced price; and this doctrine applies especially to assignee; and also to one of two or more assignees, who may have bought and resold.—*Fox* vs. *McKreth*, and the cases there cited ; Leading Cases in Equity, Law Lib., Vol. 35, 3d Series; *ex parte Wiggins*, 1 Hill Ch., 353; Hill on Trustees, 538.

The sale of the negro was an executed contract, and Dial will be supposed in equity to have received the purchase money in 1856, when the sale was made, and the purchase made by himself.

Dial compromised the debts against the assigned estate after he was *substantially* a trustee, and with the assets of the estate.

In this case, there was the double vice of a trustee availing himself of his position and of the trust funds for his own benefit, and he can only be allowed the amount actually paid out by him in these compromises.—*Fox* vs. *McKreth*, and the authorities there collected.

Aug. 29, 1871.   The opinion of the Court was delivered by

Moses, C. J.   The earnestness with which the argument was pressed in favor of the appellants, has induced us to bestow much consideration on the points it presented.   We find in them, however, nothing which so affects our minds as to lead to a modification of the decree of the Circuit Chancellor.   If we reverse his judgment, and permit Dial, the assignee, to avail himself of the advanced price at which he sold the lands, we would infringe upon a rule fixed and determined, not only by the Courts of Equity in England, but in this State—a rule most salutary in its influence, and one which, by reason of the prejudicial consequences which its enforcement averts, should be jealously watched and preserved.

Mr. Lewin says :   " It is a general rule established to keep trustees in the line of their duty, that they shall not derive any personal advantage from the administration of the property committed to their charge."—Lewin on Trusts, 318.   Even while it remains in their hands, they are bound so to regard and manage it, that all its profits shall enure to the advantage of those who, by the terms of the instrument establishing the trust, were entitled to its enjoyment. If while the trust exists, he who has the control of it cannot convert its profit to his own use, with how much more reason does the restriction apply, when he attempts to part with the whole fund through a sale for his own benefit.   If a deed confers a power to sell, it is to be exercised in favor of those who have an interest under it.   Lord Roslyn well said in *Whichcote* vs. *Laurence*, 3 Vesey, 750, " he who undertakes to act for another in any matter, cannot in the same matter act for himself."   From the very circumstance of his thus changing the relation which he bore to the subject of the trust, a presumption arises that he was influenced by motives of private gain.   " The principle is that as the trustee is bound by his duty to acquire all the knowledge possible to enable him to sell to the utmost advantage for the *cestui que trust*, the question, what knowledge he has obtained, and whether he has fairly given the benefit of that knowledge to the *cestui que trust*, which he always acquires at the expense of the *cestui que trust*, no court can discuss with competent sufficiency or safety to the parties."—Lord Eldon in *Ex Parte James*, 8 Ves., 750.

The question is not to be tested by the fairness of the transaction measured by the adequacy of the price.   This consideration does not enter into the doctrine which forbids a trustee for sale himself to become the buyer.   The results which would follow the

allowance of such purchases are fraught with so much danger, that looking to the relations of the parties, the superior advantages of the trustee, and the temptations by which he may be seduced, no exception is allowed to the general rule by shewing the honesty of the particular transaction, and that the *cestui que trust* has suffered no prejudice. The characters are too inconsistent to be influenced by the same considerations. "*Emptor emit quam nimino potest, venditor vendit quam maximo potest.*"

It would be an unnecessary task to refer to the numerous authorities which sustain the position taken by the decree in regard to the sale of the land. Chancellor Kent, in *Davone* vs. *Fanning*, 2 John. C., 252, with his accustomed research and examination, has collected the leading cases which maintain the same doctrine, and with his usual elegance of expression reviewed the reasons on which it proceeds ; and it is only necessary to refer to his lucid opinion, which, in a concise but perspicuous manner, sustains the conclusions which the Courts have reached on this question.

It is said, however, that if these plaintiffs had any right of complaint, they have not exercised it by either holding Dial to his purchase, or electing to have a re-sale. It was competent for the plaintiffs to recognize the re-sale by waiving all claims against the purchaser, Fuller, and to regard the sum which he paid for the property as its true value. If the title had remained in Dial, they could have either held him bound to his bid, or demanded a re-sale.

They may elect to treat the sale to Fuller as the only one made by Dial, and so it must be regarded, if the sale to him was void at the option of the *cestui que trust.* They were not bound to ask a re-sale. The property had passed into other hands, and if they so prefer, they may claim the purchase money as received by Dial to their own use. The object of a re-sale is only to ascertain if a price can be obtained beyond that which the purchaser gave to the trustee, and if the *cestui que trust* is willing to accept it as the value, all the objects to be accomplished by a re-sale are attained. Mr. Sugden says : "Where a trustee buys the trust estate at a fair price the sale is seldom called in question, unless he afterwards sell it to advantage, and then the *cestui que trust* is of course only desirous that the money gained by the trustee on the re-sale should be paid to him. Owing to this circumstance, a purchaser of a trust estate from a trustee who had previously sold to himself, is seldom implicated in the suit; but it seems clear that a person purchasing with notice of the previous transaction would be liable to the same

equity as the trustee was subject to."—3 Sug. on Vend., 243. The *cestuis que trust* here are willing that the purchaser may retain the lands, while they alone look to Dial for the price he obtained.

It is said, too, by the appellants, that these plaintiffs are not *cestuis que trust* under the fourth assignment, and are, therefore, not in a condition to complain. The fifth assignment (April 13, 1855,) is to secure Dial and Farley against debts and liabilities incurred for Crews, then to discharge two certain judgments, and lastly, to pay and satisfy, in whole, if the funds are sufficient, such general creditors as may come in, and release the balance of their several demands against the assignor, and if not sufficient, to pay such creditors in rateable proportion. The plaintiffs have complied with the condition, and thus acquired rights and interests under it. The four previous assignments were exclusively for the protection and security of the said Dial and Farley. If these plaintiffs, then, can shew, that the purposes of the said assignments have been fulfilled by the payment of all the liabilities for which they provide, or that they have been so nearly satisfied as to leave but a portion of the choses transferred by the fifth applicable to them, it necessarily follows that they have such a direct interest as entitles them to a full account from the assignees of their administration of the property conveyed to them by the fourth assignment. The principle which prevents a trustee from being himself the seller and the purchaser is not restricted to such as alone act under a technical trust, but includes all who act in a fiduciary capacity. The principles laid down with reference to trustees for sale, are of course applicable to all who, though differing in name, are invested with the like fiduciary character."—Lewin, p. 265. They were recognized by our Courts in *Ex parte Wiggins*, Hill Ch., 353, in reference to the assignee, under an assignment for the benefit of creditors.

They apply, too, with still stronger force, to the debts of Crews bought up by Dial. The assignee does not represent himself alone, but he holds the fund for the benefit of all creditors who have an interest in it. In satisfying any incumbrance, good faith and fair dealing require that he should not credit himself on such account with more than he has paid. The assignment provided that if it should be insufficient to meet all the debts of Crews, the creditors were to be paid in rateable proportion. The amount to be so applied might leave nothing for the creditors unwilling to make any abatement, except that to which they were bound by the terms of the assignment, if the assignor could buy in a portion of

the claims at a sacrifice, and in the distribution of the assets demand that he should receive the full amount apparently due upon their face. At the time of the compromise of these claims by Dial, the presumption is irresistible, that he had in his hands, from the assignments, enough to meet the price he paid for their transfer to him, and yet in view of this fact, it is asked that he be allowed to retain the benefit which the creditor must be supposed to have released. The authorities already referred to reject the proposition, and as we have already said, with increased force.

In the examination of the report, we cannot perceive that Dial has been charged with any proceeds received by Farley, his co-assignee, which did not actually go into his hands, or those of his agent, Crews. The Commissioner properly discriminated between the amounts directly due by Farley, and that which was due by Dial, made up of money received by himself and his said agent.

The Court was asked by the counsel for the plaintiffs, at the conclusion of his argument, not to send the accounts back to a referee, that they may be made conformable to the directions of the decree, but at once, by its own judgment, to terminate the case. If it were in our power, we would willingly bring the litigation to an end, but a new examination of the accounts is rendered necessary by the decree, and to this requisition, the exceptions of the plaintiffs to the report in part contributed. The Court cannot undertake the duties which properly belong to its examining officers. " The province of this Court does not extend to a minute examination of long and complicated accounts."— *Wright* vs. *Wright*, 2 McC. Ch., 195. " The Court of Appeals will not undertake a detailed examination of accounts; these must be settled in the Court below."—*Myers* vs. *Myers*, Bail. Eq., 33.

We concur with the Chancellor in such parts of his decree as have not been here particularly referred to.

The motion is dismissed, and it is ordered and adjudged that the cause be remanded to the Circuit Court for Laurens County, that such orders may be taken as are necessary to carry out the directions of the decree.

*Willard,* A. J., and *Wright,* A. J., concurred.